We'll hear counsel now in Burtch v. Milberg Factors and the Appleys are sharing time. Let me ask you a question about this case. Four of the defendants are now out, is that right? There's all these stipulations that we keep getting. Who's left? Who's left, Your Honor, is HSBC, Wells Fargo, Capital, and Rosenthal. Sterling has filed the stipulation, but it has not yet been awarded by the court. April 21st, a stipulation dismissing the appeal as far as Sterling is committed to this court and that's still under consideration. By us? Yes. I thought we granted everybody. Anybody who wants to get out, we let out. Well, let's grant it orally. The same thing happened with CIT and GMAC and Milberg. They're already dismissed from this case. Yeah. The party stipulation, the order of this court. You're not on the tape, but I guess it doesn't matter. On the tape? Yeah. Okay, well, you'll write us a letter. Okay, I was just trying to figure out which red briefs to bring with me. One red brief had two parties who were out, but, well, at least one party who was still in. That was Wells Fargo, I guess. Okay, so we do read these things. Okay, I'm sorry. I just wanted to know what we had. Yes, Your Honor. May it please the court. My name is Joseph Mancano, and I represent, along with my colleague, Peter Shindell, we represent the appellant in this matter, Jeffrey Birch, the trustee in bankruptcy. I would like to reserve two minutes for rebuttal, if I may. Granted. Okay. Bell Atlantic v. Twombly, as this court well knows, did not impose a probability requirement at the pleading stage, yet that is precisely the requirement that was imposed by the court below in dismissing the trustee's complaint. The court below then compounded the error by denying the trustee the opportunity to amend its complaint for the first time. The result is that, for the last three and a half years, the trustee has been denied the ability to conduct discovery and pursue its claims against a group of defendants whose collusive behavior helped destroy Factory to You. There are two orders that are the subject of this appeal. One is an order that was entered on May the 31st, 2009, adopting the magistrate's report and recommendation dismissing the complaint, and the second order is one that was entered on June the 4th, 2010, denying the trustee's motion to amend or alter the judgment. Those are the subject of the appeal. Now, let's get into the substance. I used to be an antitrust lawyer. So I always thought, but obviously the Supreme Court has decided otherwise, that communications with respect to credit violated the antitrust laws. But obviously they don't. We know that now. The Supreme Court has held that it's pro-competitive as distinguished from anti-competitive. So what is the substance of your antitrust claim? Well, Your Honor, our position is that the Supreme Court has not said that the exchange of credit information with respect to future plans, future credit information, is immune from antitrust scrutiny. The case is, well, the principal case that's relied on by the factors in this case is the cement manufacturer's case. And it's clear from the type of information that was exchanged in the cement manufacturer's case that what was involved there was historical credit information. There's no problem if competitors exchange historical credit information, in other words, a customer's credit history. In fact, the very same information is publicly available and was publicly available to the factors. But if you're talking about future plans, whether or not you intend to extend credit to the customer in the future, at what rates, under what terms, no court has ever said that that information does not violate the antitrust laws. In fact, the distinction between past and future information was drawn not by the trustee, but by the Supreme Court in the Goldfarb case, where I believe it's Chief Justice Berger at the time points out that in Goldfarb, the situation involved not the exchange of historical information, see cement manufacturers, but it dealt with future prices. When you say historical... I'm sorry. Prices is different than credit. I'm sorry. No, no, no problem. Go ahead. On that point, if I may, Your Honor, the Supreme Court has said otherwise. Prices are not different from credit. Specifically, the Catalano case, where the Supreme Court said unequivocally that credit is inseparable from prices. And there would be really no reason to draw a distinction between credit and prices. Well, isn't that a little...  In Catalano, I thought that what they said was that an agreement to extend interest-free credit for a period of time is the equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. So, you know, I think that the judge's question is regard to whether credit per se and whether it's historical credit information, as you draw a distinction between that and future, and price is separable, the kind of issue of information in Catalano seems, in this particular case, based on what I just read, similar, at least sufficiently analogous to have a discussion. But that's really not what we're talking about here, is it? What we're talking about here is a concerted action whereby factors who are the principal source, in fact, for companies like Factory to You, the only source of financing, through concerted action... At a different level, by the way. They don't provide the credit directly to the retailer. Well, they provide... They do what's called credit check. In other words, they do a number of things. I'm sorry, I didn't mean to get into your answer. That's okay. We'll get back to it. I'm not going to forget. Go ahead. I may have lost my train of thought here. Go back to his question. Okay. Judge Greenway, you were talking about how the credit in Catalano is different from the credit that we're talking about in our case. Yes. With all due respect, Your Honor, I see that as a distinction without a difference. It would be anomalous if companies were permitted to fix credit terms and, as a result, thereby drive consumers of that credit from the marketplace. It would be anomalous if they were permitted to do that, yet not permitted to reach agreements on price. There really is no difference. The ultimate effect of that is to lessen competition generally in the market. And I think that we have to, when we look at whether or not the Supreme Court has ever authorized the exchange of future credit plans, whether or not to extend credit at what terms in the future, we have to look at the facts in the cases upon which the factors rely. Okay. Let's do it. So you say that we should draw a distinction between historical information and future. You allege parallel action, and then we look at what was done. And it seems like the defendants are all over the line. And so if you want us to draw an inference of parallel conduct because the defendants have compared and are sharing future intent with regards to the type and extent of credit information, then shouldn't we put the burden on you to allege that they've acted in a parallel fashion and isn't it undermined when it's clear that they haven't? Well, they don't have to act uniformly every time there is an exchange of information. I mean, the Container Corp case stands for that proposition. That was a situation where there was an information exchange regarding prices among the conspiratorial group within the container industry. Those that exchanged the prices were free to withdraw from the conspiracy whenever they wanted. There were times when they didn't all follow in lockstep. The problem there, which is the same problem that we have here, was there was an exchange of information with the expectation. Well, if you asked for information, requested the information, there was an understanding that you would reciprocate when the other side called you, when someone else called you for information, and that you would provide truthful information. But you're providing, by the very nature of your hypothetical, you're providing historical information. But let's take a step back for just a moment. I understand, theoretically, they don't have to be lockstep, right? I get that. But in an instance as we have here, where some are taking the draconian measure of your cutoff,  some are, we're going to keep the terms. Some are, we're going to make it better. How are we, in that scenario, to conclude parallel conduct has occurred because of the exchange of future credit information, which is akin to price, according to your brief? Well, Judge Greenaway, what we've alleged, and I think this is apparent by the amended complaint that we wanted to file, I think this is very clear from our allegations, is that following communications among the factors regarding Factory to You and their plans with respect to Factory to You, that in November and December of 2003, they uniformly cut off Factory to You's credit. In other words, boycotted Factory to You. That's the subject of our boycott claim under Section 1. Is this after they filed for bankruptcy? I'm sorry, I didn't quite hear you. Well, how does that fit in time with when they filed for bankruptcy? It's before they filed for bankruptcy. The bankruptcy filing was in January of 2004. The cutoff of credit occurred in November and December of 2003. But it was known that they were shaky. They were shaky but not bankrupt. And what happened was the cutoff of credit, which we submit, which we've alleged, and we would argue we're entitled to every reasonable inference from our allegations, the cutoff of credit is what pushed them into bankruptcy in January of 2004. Let me ask you a question of motive. Yes, Judge. Why would the factors care whether Factory to You is in business or not? I would presume they would want many healthy retailers in the dress market, but they're dealing with the manufacturers. And as long as the manufacturers have customers, why do they care particularly about Factory to You? What motive do they have to cause Factory to You's financial problems? The motive that they have is to, and I think we set this forth in our brief, Judge Roth, is to eliminate retailers that they deem might be weak and thereby minimize their risk. Well, not to lend to manufacturers who are lending to risky retailers, but doesn't the exchange of past credit information designate very quickly who's in financial problem? Well, the exchange of past credit information isn't a problem. We've never alleged that that's a problem. The problem that the reason we're alleging an antitrust violation is because these factors clearly discussed, not past credit terms and historical information, which is permissible, but future plans, what they plan to do in the future with respect to whether or not they were going to extend credit. You had bad credit. I'm sorry? I'm sorry, I didn't hear you. With respect to Factory to You, which had bad credit, that was in serious financial problems. Now, I can see why Factory to You is looking around for an explanation of why they had serious financial problems, but why are the factors going to care one way or the other whether Factory to You had problems or not? Well, they care because they want to eliminate shaky retailers because it minimizes their risk. That's what they're doing all the time. They're trying to make sure that the loans go to people who can manage them. So long as they make that determination independently themselves and not in a concerted way, there isn't anything wrong with that. When they're exchanging, perhaps I didn't express myself well before, when they're exchanging even just past credit information, aren't they figuring out who is in a bad situation and who is not in a bad situation and making their lending plans accordingly? And that would accomplish exactly the same thing that you are saying they shouldn't have been doing. Well, if they're making the decision on the basis of past information, if that's sufficient, and that's what we've argued and there are commentators, one that we've cited in our brief that say this, if that information is sufficient, the historical information, why would it be necessary to exchange information about future plans except to facilitate collusion? But why the collusion? Why? What are they trying to accomplish with the collusion? They're trying to get financially troubled retailers out of the system. And that aim is not an antitrust violation, I don't think. Well, I believe the law states that even if it could be argued that each of them, by doing that, was pursuing their own lawful self-interest, that that doesn't shield them from an antitrust violation. Gee, I thought that parallel action was not an antitrust violation and that the Supreme Court has said you have to look as to whether there's a realistic business reason for that. Parallel action alone is not an antitrust violation. Conscious parallelism, in addition, is not an antitrust violation. Concerted action, an agreement. Judge Roth says what is the rationale? The Supreme Court has told us in numerous antitrust cases in the last 20 or 25 years that you look to whether there's a realistic, practical economic reason for that, which they did. And I'm not sure how you've answered that yet. Maybe you can. I apologize, Judge Slovert, if I haven't. I believe in our brief we set forth the reason why this made sense, because the factors have argued that it wouldn't make sense for them to do this. We've argued that it would because what it ultimately does is allows them to minimize risk. Which is a legitimate business justification. Stabilize their market shares and maintain the price of their credit, which they might not be able to do if they sharpened their pencils and acted independently. Well, you know, when you say if they sharpened their pencils and acted independently, it seems to me that if you look at the paragraph 35 that we're all focusing on, if you look at the different actions that the several factors took, both pre- and post-December of 2002, you're getting different conclusions as to how each of their businesses should proceed. Some increase their credit limit to factory to you. Some decline orders. Some are taking orders but putting certain limits on it. Some are increasing credit limits depending on what the financial plan is and so forth. So I'm not getting this we exchange information, and although it might not be necessarily parallel conduct, I get that, that we're acting in a way that shows there is some agreement. Well, I think that in Milberg's brief, they made it, and I realize they're out of the case, but that brief was filed in this matter. They made it abundantly clear why they do it. They do it because- Just finish your answer because your red light is on. I noticed that, George. They do it because- Answers count, yeah. They believe that it helps them eliminate the risk. No one factor wants to be the one holding the bag, so to speak. If a retailer goes under. So they make a concerted decision not to extend credit based on information that they get from their fellow competitors who tell them we're not going to extend credit. You haven't alleged that. Have you alleged in your complaint that they agreed not to extend credit? I mean, I didn't think that that's what you alleged. We alleged that they made a decision to cut off credit entirely in November and December. By agreement? Yes. And Judge Greenaway says, but that's not the facts that we're given. It's not what's in the complaint? I mean, there are- Go ahead, keep on going. Well, I just read to you what I did, and I don't think you really answered my question. So maybe you can help me and just focus on this notion. Despite the information you believe they've received and the actions that shows collusion, it appears from the information that's in the 27 paragraphs, right, of paragraph 35- You're talking about the initial complaint that we filed. Right. Well, that information, I mean, the essential information is in the proposed amended complaint. Well, the proposed amended complaint contains over 60 inter-competitor communications, and it provides- Essentially the same. Essentially the ones that I'm talking about plus more. Yes, Judge. It contains the ones that you're talking about plus more. Correct. So I'm actually looking at a better sampling because if it's disparate to the beginning, it's not going to get any better unless you've taken all these out, right? If there's examples in your original of disparate actions, disparate actions taken by them, and you've essentially taken that and then added more, the question still remains. So my question to you is, if there's disparate action post-December, post-November, how are we to conclude that there's an antitrust violation based on those allegations? Just so that I understand your question, you're saying post-November, December 2003? I'm using your dates. I don't, frankly, at the moment recall whether you said 2002 or 2003. The cutoff occurred in November, December 2003, and in our proposed amended complaint, it's very specific as far as who cut off credit. It was uniform at that time, and it followed conversations. There were also other allegations in the proposed amended complaint where I can give one example where two of the companies, Milberg and Sterling, immediately after a conversation, reduced their credit lines to factory to you to $250,000. Mr. Mancano, I am not the potted plant. My job is to look at the lights. We've given you ample time. Thank you, and we'll hear from you. You get two minutes rebuttal. Thank you. We don't do what the Supreme Court does. We don't limit you to rebuttal to what she says. Thank you. Good morning, Your Honors. I'm Celia Barinholtz, and I represent HSBC. Ms. Barinholtz, you have eight minutes. Yes. Thank you, Your Honor. I'm going to address the sufficiency of the complaint and the Twombly standard, and my colleague, Mr. Beitel, will address the legality of sharing credit information and also the district judge's decision not to grant leave to amend the complaint. All that in seven minutes. Okay. Okay. Judge Roth, I'd like to start by trying to answer your question, which was, why would the factors care whether factory to you remained in business or not? And the answer to that question is, actually, the factors would want factory to you to be in business for the simple reason that factory to you owed them money. And the longer they were in business and had customers coming through their doors and buying their merchandise, the greater the likelihood that the factors would be paid the debts that they were owed by the retailer here. Could you explain that to me? I thought there was no relationship between the factors and you two, that it all went through the manufacturers. It's an indirect relationship, and let me explain how it works. The factor has a contract with its client, the manufacturer. In that contract, the factor agrees to purchase the accounts receivables of the manufacturer. The manufacturer assigns the invoice to the factor. Before accepting that invoice, before doing that, the factor credit checks in the parlance of the industry the retailer. If it decides that it wants to take on that credit risk, it purchases the invoice. If it doesn't want to take on that credit risk, the client is free to do business with the retailer, and the proposed amended complaint shows that these retailers were doing business directly with the manufacturers. That's called at the client's risk. No, not with the manufacturers. You mean with the factors. No, I'm saying if the factor doesn't want to purchase the invoice, the client, the manufacturer, is still allowed to sell goods to the retailer, and I'm saying in the proposed amended complaint there are very clear allegations that, in fact, manufacturers who had relationships with five of the factors here were dealing directly with the retailer at their own risk. They decided they would take on that credit risk that their factors didn't want to take. So the factor who's purchased invoices, even though it has no contractual direct relationship with the retailer, factory to you, it certainly wants factory to you to remain in business. It has no interest whatsoever in driving them out of business. And that goes to another argument that Plaintiff's Counsel made. Obviously the factors have no interest in taking on credit risk with respect to a business that's about to go out of business. That would be foolish, and they have no interest in doing that. But they don't all have a need to act together. And the facts here, as pleaded in the complaint, shows that they didn't act together. Factory to you declared bankruptcy in January of 2004. And the allegation in the proposed amended complaint is that in November and December all the factors got together and said we're not going to extend credit to you or take credit risk as to you anymore. But the specific allegations of the complaint say that in February of 2002, one of the factors, Wells Fargo, had stopped extending credit. It didn't want to take factory to you's credit risk anymore. And in October of 2002, my client, HSBC, stopped extending credit to factory to you. Two factors in February and October are out of it with respect to factory to you. And then over time, the other factors take different positions. Sometimes they're extending credit, sometimes they're not. It goes up, it goes down. But at the very end of the period covered in October of 2003, the complaint alleges, the proposed amended complaint alleges, that there's still a couple of factors who are taking risk, who are extending credit to factory to you. So they're not marching in lockstep. They're not doing the same thing. And there's a whole host of reasons why they would take different positions. We've talked about the factoring relationship here and that there are clients who retain the factor. Well, some of those clients do a lot of business with factory to you, and so they're pushing their factor. I want you to take credit risk as to factory to you. And the factor, if he has a lot of clients that do business with factory to you, then they may feel pressure to take that credit risk. Other factors have very, very few clients who are doing business with factory to you, and they can be tougher. They can say, you know, I don't like that credit risk, and if you don't want to use me as your factor, so be it. And that's, again, something that's alleged in this complaint, that my client, for example, had 30-some-odd clients who were dealing with factory to you. Another factor, CIT, had hundreds of clients who were dealing with factory to you. So it's not surprising at all that the factors are acting differently. And coming back to the issue of whether the district court here was correct when it said this claim doesn't state an antitrust claim, it focused on the element of agreement which is applicable to each and every one of the Section 1 claims here. And it looked, you know, under the standard of Quambly, are there facts here that show an agreement? And the only facts that were propounded to show agreement was the alleged parallel conduct, which as my discussion, I think, has made clear, and as the complaint makes clear, isn't even parallel conduct. So Quambly, I think, is a hard case to apply in different circumstances, but in the context of a Section 1 claim based on parallel or allegedly parallel action, it's an easy application. How does the dismissal of, I think it's, I guess, four now, four defendants affect any of the analysis? Well, I don't think it, I mean, a conspiracy is alleged, so I think that, you know, four defendants were dismissed, but a conspiracy was never pleaded as to any of them. Okay. Finally, just coming back to Catalano, I think when you look at the factoring industry, you see why Catalano doesn't apply, because Catalano was a beer wholesaler, beer wholesalers all getting together and saying, we're not going to give the people who we sell to, the retailers, credit anymore. They have to buy on cash. That's our, we'll all get together and decide cash only. When you're dealing directly with each other in that way, you can see how the credit or insistence on a cash sale becomes part of the price of the services. But for factors, the price of their services, it's really between the client and the factor, how much the factor is charging their clients for factoring services. When they deal with the retailer, with factory to you, they're not in a price-setting relationship. They're taking on credit risk. So in Catalano, the extension of credit is analogous to price because they agreed on a particular set of credit terms. Exactly. It was part of the price because if you sell on credit, you're, in effect, giving a discount. And if you're saying cash only, you're not giving that discount. And so when all the wholesalers say, hey, we're only doing cash terms, in effect, it's part of the price. And it's a price-fixing case. It's not an information-sharing case. It's a price-fixing case. Thank you, Your Honors. Thank you, Ms. Bickel. Ms. Berenholtz. May it please the Court, my name is Bernard Bitel. I represent Wells Fargo. I also represented GMAC and Sterling. And just to clear up the discussion that took place at the outset, Sterling is a stipulation permitting Sterling to be dismissed from this case. It was submitted to this Court on April 21st. That has not been signed yet. I don't remember it coming to my desk. But it will be signed when it comes. Yes, Your Honor. And I just, I think in honor to your Judge Greenaway's question, for the defendants, including the two largest defendants, were dismissed as a torsion to settlement of adversary proceedings relating to preference actions in the bankruptcy court. I think it does have some impact on the seriousness of this case. You mean it's not? I don't understand. Which way does that deal? You mean it's not as serious as it looks? Well, when you settle $12 million worth of preference claims for about $4 million and you dismiss the antitrust case involving treble damages and driving a $200 million firm out of business, I think it has some impact on the analysis of the allegations, which are deficient on its own. But that just was an added element that I would like. It's very clear that this court gives the same attention to a case, let's say a little misdemeanor and a great big felony, and the same has to do with civil cases. It doesn't really matter to us. I mean I just did one that was close to $2 billion. It's just zeros. They're just numbers. We care about the legal issues. I understand that. And I was not trying to indicate that the court should take a serious consideration. It's just that the plaintiff in this case did resolve four of the cases, and that was the setting in which that occurred, and I just wanted to clarify the Sterling situation that they're not in the case anymore. Thank you. Let me address the fact that the exchange of credit information has, and I think it goes back to the cement case, which is almost slightly less than 80 years in the rule, and as cases have come along consistently applied that rule that the exchange of credit information is perfectly permissible. The Catalano case, which was the subject of discussion before, where it involved the imposition of interest charges for late payment, there's absolutely no indication in this pleading and the analysis of the telephone conversations that some specific amount was applied to add to the cost of factory-to-use acquisition of any merchandise. For example, one of the deficiencies in the pleading and the allegations that are set forth in paragraph 35 is the claim, for example, that surcharges were imposed. The surcharges that are discussed in that pleading are surcharges that are imposed upon the manufacturer, not upon factory-to-you, so there's no allegation of any antitrust damages or any imposition on factory-to-you. A surcharge is imposed in order to justify the factor taking the risk on a particular invoice, and the manufacturer will pay the factor a little slightly additional commission for the factor to take the risk. Let me ask you this question. Your adversary says that really what this case is about is the exchange of future information and future action. I hope I summarized what he said accurately. If that were the case, I know you'd probably dispute that it is, but if that were the case, would that be an antitrust violation? I don't believe there's a single case that's indicated that the exchange of future plans, in fact, I think the baby food case indicated that the salesmen were talking about future prices that the intended and this court didn't find that actionable. Without the conspiracy, the concerted action, I don't believe would be actionable. But analysis of the conversations that are alleged either in the operative complaint or the proposed amended complaint do not indicate any agreement on any term in the future. In a discussion, for example, the statement that we have a credit line of X million dollars doesn't indicate future conduct because each invoice is subject to its own analysis as the invoice is presented to the factor. No demonstration here that anyone acted uniformly. For example, as my colleague pointed out, when credit was declined by Wells Fargo, which was consistent, why should Wells Fargo join a conspiracy? It was consistently declining credit for a long time, felt this was not a good credit risk. HSB started at another point in time. Why would they join a conspiracy? Yet there were other factors that were extending credit. So there's no uniformity and there's no collusion, there's no agreement. None of that is addressed. Now, another issue, and I see my yellow light is on, but let me get into the fact of the motion to amend the pleading. The setting in which that occurred, which is unique in itself, doesn't exist in any case that dealt with the issue of Rule 15, Rule 16, Rule 59. He had a pleading which was defective. A motion is made which outlines what we claim are the defects. We then go before the magistrate judge and we work out a scheduling order. Scheduling order sets a date a year later when the pleading has a right to be amended. We go before magistrate judge, now Judge Stark. Judge Stark points out, how do I factor in that you're left out in your pleading, information which you should know? For example, if you claim that invoices were uniform, allege some facts not put in that terms are. I see my red light. May I just finish the thought? Yeah, finish the thought and then start. 15 days, 30 days, 60 days, 90 days, that doesn't allege a conspiracy. That doesn't allege uniformity. That doesn't allege parallel conduct. So the court in the argument of the motion pointed out deficiencies of pleading. No application to the magistrate judge, which was the required procedure for leave to serve an amended pleading. Then we went before, after the recommendation comes down before Judge Farnan. May I finish? Okay. Go ahead, finish the thought. Yeah, okay. Go before Judge Farnan. That's a long thought. And again, at that point, the allegation, the request is made to file an amended pleading. No amended pleading contrary to the rules is submitted to the court. So he rejects that application. Meanwhile, the time to serve an amended pleading as a right disappears. So all these elements indicated the judge exercises discretion correctly in refusing to permit amending. Thank you for allowing me to continue. Thank you, Mr. Feigl. Okay, we'll hear the two-minute rebuttal. Two minutes. Thank you. With respect to the distinction that has been drawn between exchange of historical information versus future information, in addition to the Supreme Court, U.S. Supreme Court, recognizing that distinction, we would argue in the Gold Farm case, it's interesting that members of the credit industry, as we set forth in our initial brief at pages 28 through 31, I believe, also recognize that distinction. We pointed out that the National Association of Credit Managers and its antitrust guide tells all of its members that they can pass credit, but not prospective information concerning prices or credit policies or terms or conditions of sale. The printing industry tells its executives the same thing. We also attach to our brief as an exhibit an opinion from Ann Bingaman, who was the Assistant Attorney General in charge of the antitrust division in 1994, where she expresses the same opinion. The Emergency Department Practice Management Association, in its antitrust guidelines, tells its members they're not to exchange prospective credit terms. The International Digital Publishing Forum says the same in dues and dotes of antitrust. The U.S. Green Building Council, in its antitrust compliance policy, does the same thing. The ABA antitrust section, in its antitrust compliance publication, says likewise. So this is not something that is unusual, unprecedented. This is... The point here is that this is generally recognized. The factors are the only ones who have taken this position from everything that we can determine based on our research. Thank you.